THE APOSTOLIC, ROMAN CATHOLIC CHURCH IN PUERTO RICO, DIOCESE OF SAN JUAN, Appellant, v. THE REGISTRAR OF PROPERTY, THIRD SECTION OF SAN JUAN, Respondent.

No. G-62-19.    Decided October 8, 1968.

---

*Heriberto Torres Solá* for appellant. The respondent Registrar appeared by brief.

Second Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Dávila, and Mr. Justice Torres Rigual.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Appellant, the Catholic Church, was the owner, by gift of the Long Construction Corporation in 1953, of a parcel of land having an area of 3,636.22 square meters, situated in the housing development "Caparra Heights Extension" in Ward Monacillos in San Juan. It was recorded in its name in the Registry of Property subject to the servitude constituted in favor of the Water Resources Authority and to certain restrictive building conditions.

On December 20, 1955, the Catholic Church and the nonprofit association denominated "The Order of Friars Minor of the Province of the Most Holy Name," domiciled in the city of New York, executed a public deed by virtue of which the former conveyed to said association the aforementioned parcel of land on the following stipulations:

"............................................. FIRST: .............................................
......The Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan, through its Most Illustrious Bishop Monseigneur James P. Davis, sells in favor of 'The Order of Friars Minor of the Province of the Most Holy Name,' the urban property whose area has been described in the preceding first paragraph, conveying it to the purchaser with all its uses, rights, servitudes, and belongings inherent thereto, this title serving as proof of possession binding the vendor to the warranty against eviction............

............................................. SECOND: .........................................
......This sale is executed for the price of ONE DOLLAR which the vendor confesses having received from the purchaser prior to this act, and for other considerations of immensurable religious significance, taking into consideration, also, the investment of SEVENTY–FIVE THOUSAND DOLLARS that The Order of Friars Minor of the Province of the Most Holy Name will make on the land hereby conveyed for the construction of a church, parochial house or residence, a school and other dependencies.....
............................................... THIRD: .........................................
......For the purpose of cooperating with said purchasing religious institution, the Catholic Church assigns to the former said parcel of land so as to endow the community of Caparra Heights Extension with religious and educational facilities and specifically to endow it with a church.................................................................
............................................. FOURTH: .........................................
......This sale is executed without any other limitations than the aforementioned servitude in favor of the Puerto Rico Water Resources Authority and the restrictive conditions concerning present or future constructions imposed by the Planning Board; the land being valued, for all pertinent legal purposes, at the amount of EIGHTEEN THOUSAND ONE HUNDRED EIGHTY–ONE DOLLARS AND TEN CENTS...............................................
............................................... FIFTH: .............................................
......The purchaser binds itself with the Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan, not to assign, alienate, sell, or encumber in any manner whatsoever, lease or assign the use or usufruct of the land and whatever is built thereon, to any entity or person, except to the Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan; and in the event that said entity must leave or definitively depart from the island, it binds itself to sell to the Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan, the previously described parcel of land for the same amount of ONE DOLLAR for which they buy from the Church and for ONE EXTRA DOLLAR which is fixed, by mutual agreement, as the price for any construction which may have been built or is built on the parcel of land.".................................................................

The new title holder of the parcel of land constructed thereon two concrete buildings, one, a two-story building

called *"Colegio Mother Cabrini"* and the other, a one-story building, denominated *"Iglesia Mother Cabrini."*

On May 22, 1961 the title of acquisition of 1955 was presented for record in the Registry of Property. On that same date a mortgage constituted on the parcel and its constructions in favor of the Jefferson Standard Life Insurance Co. was also presented by the purchasing association, with the approval of the Catholic Church, to secure the payment of a loan amounting to $90,000.

The deed of acquisition gave rise to the third registration of the property entered on October 22, 1962. This record entry, insofar as pertinent, reads as follows:

"The Apostolic, Roman Catholic Church, Diocese of San Juan, is the owner of this property, as it appears from the second entry, and represented by its Most Illustrious Monseigneur James P. Davis, Bishop of San Juan, of legal age, single, and resident of this capital city, sells it to The Order of Friars Minor of the Province of the Most Holy Name; which association was constituted and organized for non-profit purposes pursuant to the laws of the state of New York, Registered in the Department of State of the Commonwealth of Puerto Rico, represented by Reverend Bernardino Ward, O.F.M., of legal age, single, resident of this city, for the price of one dollar, previously received, and for other considerations of immensurable religious significance, taking into consideration, also, the investment of seventy-five thousand dollars which the purchaser will make on the land conveyed, for the construction of a Church, parochial house or residence, a school, and other dependencies, and for the purpose of cooperating with said purchasing religious institution so as to endow the community of Caparra Heights Extension with religious and educational facilities and, specifically, to endow it with a Church; the land being valued, for all pertinent legal purposes at eighteen thousand one hundred and eighty-one dollars and ten cents. The purchaser binds itself with the Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan, not to assign, alienate, sell or encumber in any manner whatsoever, lease or assign the use or usufruct of the land and whatever is built thereon, to any entity or person except the Apostolic, Roman

Catholic Church in Puerto Rico, Diocese of San Juan; and in the event that said entity must leave or definitively depart from the island, it binds itself to sell to the Apostolic, Roman Catholic Church in Puerto Rico, Diocese of San Juan, the previously described parcel of land for the same amount of one dollar for which they buy from the Church, and for one extra dollar which is fixed by mutual agreement, as the price for any construction which may have been built or is built on the parcel of land. By virtue thereof, I record in favor of The Order of Friars Minor of the Province of the Most Holy Name, the property having this number by deed of purchase hereby refusing to admit to record that clause of the fifth paragraph of the deed, according to which the purchaser binds itself not to assign, alienate, sell, or encumber, in any manner whatsoever, lease or assign the use or usufruct of the land or whatever is built thereon, except to the Apostolic, Roman Catholic Church in Puerto Rico, by reason that said condition is illegal, and a cautionary notice for one hundred and twenty days is entered instead in favor of said Apostolic, Roman Catholic Church in Puerto Rico."

The registrar's note written at the foot of the title deed recorded, says:

"Record of this document, after examining others, is hereby entered, at folio 96 of volume 503 of Monacillos, property No. 18,272 (13,309 before) 3rd Rec., but it is denied as to the *clause in the fifth paragraph* because it is illegal. Subject to restrictive building conditions and servitude in favor of the P.R. Water Resources." (Italics ours.)

Against said denial the Catholic Church filed the present administrative appeal. It maintains that the note appealed from should be reversed and record of the FIFTH clause ordered, because (1) the entire contents of the document should have been examined in the Registry "concomitantly with the intention of the parties and objects and purposes of the contract," since the nature and juridical effects of said clause could not be qualified isolatedly; (2) that such clause was not an illegal agreement, but a necessary condition, and (3) that it is either a sort of contract of sale with

right of redemption or a gift with a resolutory condition at law.

On his part, the Registrar requests the affirmance of his note because (a) the fifth clause is an illegal agreement which limits and curtails the right of ownership and which violates § 280 of the Civil Code and Art. 107(4) of our Mortgage Law, and that the same, "at most, is an unrecordable obligatory bond of the so-called right of option, of a purely personal nature, without any real transcendency."

## I

First, we want to make the following observation:

The FIFTH clause, inserted at page 503, consists of two agreements. Under the first, the purchasing institution, The Order of Friars Minor of the Province of the Most Holy Name *binds itself with the Catholic Church* not to assign, alienate, sell, or encumber, in any manner whatsoever, lease or *assign the use or usufruct of the land and whatever is built thereon,* to any entity or person *except to the* Apostolic, Roman *Catholic Church,* Diocese of San Juan.

Under the second, the new title holder, "in the event that said entity must leave or definitively depart from the island, it binds itself to sell to the . . . Church . . . the . . . described parcel of land for the . . . amount of one dollar, for which they buy . . . and for one extra dollar which is fixed . . . , as the price for any construction which may have been built or is built on the parcel of land."

From the third entry in the Registry copied above, it clearly appears, first, that *both* agreements were included therein, although subsequently, in the same entry, it is stated:

". . . hereby refusing to admit to record that *clause of the fifth paragraph* of the deed, according to which the purchaser binds itself not to assign, alienate, sell or encumber, in any manner whatsoever, lease or assign the use or usufruct of the land or whatever is built thereon, except to the . . . Catholic

Church . . . , *by reason that said condition is* illegal, and a cautionary notice for one hundred and twenty days is entered instead in favor of said . . . Church." (Italics ours.)

In limiting the refusal to the first agreement, the second was definitively included in the third entry of the property, although the registrar's note does not state it so clearly. It is stated therein that record of the document had been denied "at folio 96 . . . as to the *clause in the fifth paragraph* because it is illegal" leaving the impression that the fifth clause was denied in its entirety.

## II

From what has been observed, the crucial point to be decided in this appeal is merely whether or not the first agreement of the FIFTH clause as to which no record was made and by virtue of which the purchaser binds itself not to convey the parcel of land and its constructions to any entity or person except the Catholic Church is recordable.

■ The Registrar in his note simply indicated that he denied record of such obligation because "it was illegal." Thereby he failed to comply with the legal provision to set out "clearly and concisely at the foot of the document his reasons for the refusal." It is in his memorandum that he states the following and principal reason to support his refusal: The fifth clause, in its first denied agreement, is null and void because it constitutes a typical and real prohibition to alienate or dispose of, which renders its registration impossible at law.

In support of that approach to the problem, among other things, he states in his interesting memorandum:

"And we come now to the gist of this case, that is, whether, in view of the provisions contained in §§ 1111 of Title 31 and 203 of Title 30 L.P.R.A. (§ 280 of the Civil Code and Art. 107 of the Mortgage Law), it is possible to record a clause which limits and curtails the right of ownership.

". . . . . . . .

"The Order of June 9, 1914, of the General Directorate of Registries states that if the agreement to execute another mortgage lien is void pursuant to Art. 107 of the Mortgage Law, with greater reason the agreement not to alienate should be considered equally void because it is more restrictive. IV Roca Sastre and Molina Juyol, *Jurisprudencia Registral* 1060 (1914).

"The modern tendency is even more radical as to the opposition to admitting clauses like the one hereby denied, which is the object of this appeal.

"Modern legislation and case law are more and more opposed to the admission, with mortgage effects, not even under the guise of conditions, of contractual prohibitions of the owner's power to dispose of the properties, making exception of the civil effects derived from the noncompliance with the agreement . . . . Order of November 25, 1935 of the General Directorate of Registries—VII Roca Sastre and Molina Juyol, *Jurisprudencia Registral* 715—because 'such limitations, directly or indirectly established, diminish or foreclose the possibility that the owner of the properties constitute subsequent mortgages, excessively extend the powers of the creditor, seek to create juridical situations which surpass the rational and legally determined measure, alter the guarantees that the adjective laws establish in favor of the interested parties, and definitively, are unfavorable to the promotion of the credit secured by real estate, the fundamental basis of our mortgage system. . . .' Order of November 25, 1935, *supra* (the same page)."

That approach to the problem follows one of the tendencies of the controversy on the matter—the obligatory—still existing among the Spanish authorities on mortgages, many of whom attribute real efficacy to the typical and true prohibitions to dispose, and defend their admission to record.

■ The prohibition to dispose or alienate has been defined as the impossibility to convey or alienate, for a valuable or for a good consideration, a thing or right, by virtue of an agreement, legal provision, or judicial or administrative decision. Also, as the situation resulting from declarations of will made in a juridic act by which a person is denied the

power to dispose of properties or rights normally alienable. By reason of their origin, extent, duration, nature of prestation, and the time they become valid, said prohibitions have been classified into: (1) voluntary or conventional, legal, judicial, or administrative; (2) absolute or relative; (3) indefinite, perpetual or temporary; (4) onerous and lucrative; (5) inter vivos and mortis causa.[1]

It is true that, mainly, against the conventional, absolute, and perpetual prohibitions to dispose, among other things, it has been said: they produce the indefinite amortization of the property; they adulterate and denaturalize the right of ownership, depriving it of one of its most essential elements or powers; they obstruct the judicial business; they violently curb the mortgage record of the properties, constituting a bar to the recording of any future transaction thereon; they may create uncertainty as to the honesty of the debtor or obligee; they constitute a suicide of the very *ius disponendi*, and create ambiguous and confusing situations; they are to be considered by the civil law as illegal agreements since they are contrary to the morals and public policy and are contrary to the principle of the freedom to contract; they retract from the human will its generating power; that the indeterminate have the negative value of a limitation without title depriving rights, which have been legally declared transferable, of their condition of transferability; that the determinate reduce the ambit of the persons with whom it is possible to contract; that they permit the debtor in bad faith to swindle his patrimony; they directly limit the credit secured by real estate and constitute an obstacle to the flow of wealth, exercising nefarious influence in the entailment of real estate; they are repugnant to law and provoke a

---

[1] See I Jerónimo González Martínez, *Estudios de Derecho Hipotecario y Derecho Civil* 486 *et seq.* (Madrid, 1948); Roca Sastre, *Derecho Hipotecario* 365, 366 (5th ed. Barcelona, 1954); De Casso Romero, *Derecho Hipotecario* 387 and 388 (4th ed. Madrid, 1951).

pathologic, parasitic, and abnormal situation on the property rights; they act as a self-annihilation of the ownership right and constitute an abusive exercise of the right to dispose.

In Spain, with the reform of 1944–46 the mortgage problem presented by the prohibitions to dispose in juridic acts, other than wills or gifts, was legislatively settled by providing in Art. 27 of the Law that such prohibitions "shall not be admitted to record." Those derived from acts for a valuable consideration were reduced to a mere civil existence at the personal obligatory level, without prejudice that their compliance be secured by mortgage or any other manner of property guarantee. Then, pursuant to Art. 57 of the Regulations the act or contract containing them and the mortgage deed or the other property guarantee constituted shall be recorded in one sole entry and it shall be stated that the record of the prohibition to dispose is denied.

That legislative reform did not satisfy the Spanish juridic opinion. See: What has been written on this particular in II Roca Sastre, *Derecho Hipotecario* 394 *et seq.* (5th ed.) ; Enrique Alpañés, *Estudio de las Prohibiciones de Disponer*, 188 *Revista General de Legislación y Jurisprudencia* 79 *et seq.* (1950) ; *Comentarios a la Ley de Reforma Hipotecaria* 184 and 186 (Madrid, 1945) of Ramón de la Rica y Arenal.

At page 186 De la Rica comments:

"Maybe this reform has stepped beyond the happy medium in absolutely prohibiting, as it does, record in the Registry, of the contractual prohibitions to dispose, disregarding the function of guarantee and protection of legitimate interests which they can discharge with evident profit on certain occasions particularly today, when all that is obligatory has been fulminated from the ambit of the Registry. The sternness of the law could have been moderated by admitting to record said kind of prohibitions within strict limits: short term, not longer than ten years, for example, and for a rational and juridical purpose,

insofar as they seek to favor particular title holders or protect juridic positions of third persons."

Roca Sastre, in turn, expressed his opinion in his critical analysis of the matter as follows:

"c) As to Art. 27 we must criticize its excessive radicalism in excluding from the Registry all prohibitions to dispose established in acts for a valuable consideration without excepting certain concrete cases in which the prohibition may render certain services.

"We have already indicated the convenience of the prohibition to dispose as a means of securing the obligation to pay the deferred price in the sale, since aside from its temporality and the justifiability of the precaution it is absurd that one cannot do by way of a dispositive prohibition, what can be done by means of a condition subsequent or precedent, particularly considering that it is not so strange to hinder the sale of a thing purchased at a deferred price. As stated by De la Rica, perhaps the present Mortgage Law has gone beyond the happy medium, in absolutely prohibiting, as it does, record in the Registry of contractual prohibitions to dispose, disregarding the function of guarantee and protection of legitimate interests which they might discharge with evident profit on certain occasions.

"This absolute or total rejection from the Registry of the prohibitions to dispose established in acts for a valuable consideration constitutes a measure which one wonders whether it responds to a reason of illicitness or of real intranscendency. If it responds to the latter, we believe that the facts are being exaggerated since there is no doubt that private individuals may alter directly the *ius disponendi*, actually limiting the exercise thereof, within specific limits, instead of adopting a mere obligatory agreement. If it responds to the former, that is, the view of illicitness, considering that said prohibitions to dispose, by reason of the amortization they produce on the property, are repugnant to law, then we must raise the objection that perhaps said general rule of illicitness is too absolute, since aside from the fact that there are justified exception cases, it must not be forgotten that, aside from the acts for a valuable consideration, plain validity is acknowledged to the prohibitions to dispose. As a matter of fact, Art. 27 of the Law is inspired rather by the

view of real intranscendency of these prohibitions, for which reason, it is more open to criticism.

"The General Directorate of Registries had adhered to the tendency which distinguishes, in the conventional prohibitions to dispose, the real effects of the obligatory, denying the former and affirming the latter, because it believed that in the obligatory order there prevails the principle of the autonomy of the will (§ 1.255 of the Civil Code), unlike the field of the property rights where there prevails a view contrary to the amortization of the property. This doctrine does not focus the problem from the viewpoint of *legality* of the prohibitions to dispose agreed upon, but on that of its *efficacy*, acknowledging the latter fully, but only in the obligatory order; that is, attributing to them the exclusive virtuality of a mere agreement not to dispose, the violation of which gives rise to an obligation to compensate damages; on the other hand, it denies to them hindering effects or denial to record which are the origin of the nullity of the act to dispose executed against the prohibition.

"Franco Negro affirms that the efficacy of the conventional prohibitions to dispose must be merely obligatory, since the private individuals cannot establish an inalienability with *erga omnes* transcendency attributing real efficacy to a bond, which, because of its nature, is eminently personal. Jerónimo González, maintains identical view, considering that in the field of property rights the role of the will is less important than what the laymen believe, since they are, in a certain way, coined money, the weight of which should not be left to the discretion of the contracting parties. On the other hand, § 1.255 of the Civil Code does not oppose the agreement which prohibits the purchaser to alienate the thing acquired; the contractual obligation may be valid and the liabilities for noncompliance, enforceable.

"We believe that it is rather preferable to situate the problem concerning the value of the conventional prohibitions to dispose within the field of its legality than in that of the distinction between its real and obligatory efficacy. If such prohibitions are considered illegal, because they are disapproved by the Law, in view of the requirements of the organization of property, they should be rejected as such, and therefore, considered unrecordable in the Registry of Property; if they are considered lawful private individuals should be permitted to establish them— like other juridical figures—either as a mere obligatory agree-

ment not to dispose, in which case, naturally, they should be unrecordable, or as an internal modification or of the contents of the ownership or property right, since they affect the exercise of the *ius disponendi,* in which case they should be admitted and considered recordable, without prejudice of imposing on them certain requirements of temporality, reasonable purpose or advantage for somebody."

In his aforementioned treatise De Casso Romero comments, at page 391:

"CRITICISM. As we have said, it does not seem justified that systematically, the record of the voluntary or *conventional* prohibitions to dispose, *for a valuable consideration,* inter vivos, should be denied; because aside from the fact that there are cases in which their record would seem very natural and even compulsory—like when the payment of the price of the sale is deferred—there is no reason whatsoever to consider them *illegal,* or to deny them real transcendency. They are not illegal, since they are not condemned by any natural or positive rule, and, on the contrary, as we have already pointed out, nowadays there is a universal reaction against the obstinate 'disamortizing' idea of the past century, seeking to defend, for many juridical and economic purposes, the return of the familiar and associative ties, so unsubstitutional, according to historical experience. And as to the *real intranscendency* of such prohibitions, it is arbitrary, especially after admitting the record of prohibitions for a *good* consideration and of *mortis causa*; and, furthermore, because if they are not illegal, the title holder cannot be deprived of his power to impose limitations to the successor in interest, also by act inter vivos for a *valuable consideration,* or that he require that it be thus stated in the Registry *erga omnes.*"

As we have seen the refusal to record in the new Art. 27 of the Spanish Mortgage Law did not absolutely abolish from existence in the Law all the prohibitions to dispose imposed on acts for a valuable consideration. The controversy in connection thereto is still open. Influenced by the work of the master, Jerónimo González, a strong supporter of the view of *numerus clausus* in registration matters, there are authors who still consider all of them as mere obliga-

tory agreements or pacts, having no mortgage efficacy against third parties; but there are others who, with certain exceptions, recognize them as actual recordable property rights, because they engender situations of subjection inherent to the thing and with *erga omnes* efficacy.[2]

There is a marked conceptual contrast between the case law of the Supreme Court of Spain and that of the General Directorate of Registries as to the system of *numerus apertus*. As Lacruz Berdejo states, while the latter appears, in the analysis of concrete propositions, very restrictive as to its characterization as a property right or as a modality with efficacy *erga omnes* (he cites, as an example, the Order of July 6, 1949, which considered as a personal obligation a condition in a contract of sale in which it was stipulated that the building or buildings to be constructed should be destined to a diocesan seminary), the former favors the ample interpretation of the *numerus apertus*, citing the Judgment of June 25, 1945, which held that "the granting of real effects and the admission to the Registry of Property of an agreement of said nature, do not conflict in our legislation with provisions of a prohibitive nature or rules of public policy which preclude it; and if the legality of the agreement not to alienate or encumber the property in question is indubitable in the case of the litigation, and if, according to Art. 14 of the Mortgage Law Regulations whatever a restriction on the power to dispose of a property implies has immediate

---

[2] Among the former we find, of course, famous followers of master Jerónimo González: Sanz in his *Comentarios a la Nueva Ley Hipotecaria* 186 (2d ed.); Ventura-Traveset in *La Prohibición de Disponer en la Práctica Jurídica*, published by the *Academia Valenciana de Jurisprudencia y Legislación*, Booklet No. 14; and Francisco T. Talón Martínez: *Prohibiciones Convencionales de Disponer, Revista Jurídica de Cataluña, Año* LIII, Vol. LXXI, pp. 46–62. Among the latter are Roca Sastre, Alpañés, Joaquín Sapena (see his article *Sobre la Prohibición de Ceder el Crédito Hipotecario*, 33 *Revista Crítica de Derecho Inmobiliario* 345 et seq. (1957)); De Casso Romero, Vallet de Goytisolo, *Determinación de los Derechos Susceptibles de Trascendencia Registral, Revista Crítica de Derecho Inmobiliario* 186 (1961).

real transcendency, the appeal must lie insofar as it maintains that the agreement is recordable in the Registry of Property."

## III

The voluntary prohibitions to alienate or dispose, in their aspects and repercussions of record, have not been particularly regulated in Puerto Rico.[3] Our Civil Code does not deal with them unitarily, but in a scattered fashion, when dealing with gifts, with the institution of heirs, and other matters.[4]

■ The agreements not to alienate in juristic acts for a valuable consideration are legal, since they are protected by

---

[3] The bill to establish the Mortgage Code of Puerto Rico, presented on March 9, 1967 (House Bill No. 782 and Senate Bill No. 604) inspired by the German real estate law, and in Arts. 26 and 27 of the Spanish Mortgage Law, and in Art. 57 of its Regulations, proposed the approval of the following article on the matter:

"Art. 153. [Prohibitions to alienate]

"The power to dispose of an alienable property right may be prohibited, excluded, or limited by a juridic act for a valuable or lucrative consideration provided it is authorized by the law in force or any judicial order. The prohibitions, exclusions, or limitations of such power, voluntarily agreed upon in any juridical act for a valuable or lucrative consideration among private persons shall not be admitted to record, without prejudice that the amount of the damages which could be actually caused by the non-compliance with the personal obligation contracted be secured, up to the numerical maximum limit at which the parties have previously assessed it, by mortgage deed or any other form of property guarantee. In this case the onerous or lucrative judicial act and the mortgage deed or property guarantee shall be recorded in only one entry, and the record of the corresponding personal obligation shall be denied."

[4] See its §§ 578, 589, 714(2), 720, 721, 741, 1267, 1268, 1272, 1347, 1348, 1435, 1438, and 1758. Of course, those established by law enjoy a publicity which surpasses that which the Registry may provide, although they do not appear or are reflected therein. The judicial or administrative prohibitions, which exercise a cautionary function should be entered in the Registry to the prejudice of third parties, since they do not enjoy any publicity in themselves, although the properties or rights recorded can be alienated or encumbered, without prejudice to the right or of the person in whose name the cautionary notice was entered pursuant to the provision of Art. 71 of the Mortgage Law.

the principle of the freedom to contract, which subject to certain limitations is sanctioned by § 1207 of our Civil Code. Our mortgage law, generally, does not proscribe them. When they are not in contravention of the laws, morals, and public policy, there is no opposition to their admission to record, in view of the provisions of Arts. 2(2) and 9(2) of our Mortgage Law and Arts. 24, 27, 63(7), and 75(6) of its Regulations.[5]

---

[5] "Mortgage Law

"ARTICLE 2. The following shall be recorded in the registries mentioned in the preceding article:
".    .    .    .    .    .    .    .

"Second. Instruments constituting, recognizing, modifying or extinguishing rights of usufruct, use, habitation, emphyteusis, mortgages, rent charges, servitudes or any other real rights."

"ARTICLE 9. Every record made in a registry shall set forth the following details:
".    .    .    .    .    .    .    .

"2. The nature, extent, conditions and charges of any kind of the right recorded and its value, if it appear in the instrument."

"Mortgage Regulations

"ARTICLE 24. All real property and property rights therein, without any distinction whatsoever, may be recorded, whether the property be of private individuals, the State, a Province, a municipality, or civil or ecclesiastical corporations."

"ARTICLE 27. In accordance with the provisions of the first, second, and third paragraphs of article 2 of the law, not only must deeds be recorded whereby the ownership or property rights mentioned in said paragraphs are constituted, recognized, transferred, modified, or extinguished, but any other deeds relating to rights of the same character, such as the acquisition of property belonging to the reservable half of entailed estates, definite concessions of mines, railroads, public works, waters, pasture, and other similar rights, awards in settlement of debts in insolvency or bankruptcy proceedings, concession of Crown lands, the right of antichresis, the reconveyance of estates sold subject to the right of redemption, or any other legal act or contract, which, although not having its own name in the law, modifies at once or in the future, any of the rights of ownership in real property or property rights."

"ARTICLE 63. In order to indicate exactly the estates and rights which may be the subject of the records, registrars shall observe the following rules in carrying out the provisions of article 9 of the law:

■ In order that the voluntary prohibitions to dispose may coexist in the circle of the limitations and restrictions of the freedom to contract in the ambit concerning registration of real property, regulating its conditions insofar as they are useful and precluding, insofar as possible, its prejudicial effects to the traffic of property rights, it is necessary to clothe them with a series of certain characteristics to complement them, which, in the opinion of the distinguished Spanish scholars on mortgage, Chico Ortiz and Bonilla Encina[6] are summarized as follows:

(a) The prohibitions to dispose are not presumed, they must be express.

(b) They are of an exceptional nature and, therefore, they must be strictly construed, although they admit the broad construction or the analogical procedure, according to the recent doctrines of jurisprudence.

(c) They have no institutional nature, this note assuming the exclusion of the unavailability of certain things and

---

"*First.* .    .    .    .    .    .    .    .

"*Seventh.* In order to indicate the extent of and encumbrances on the right to be recorded, detailed and literal mention shall be made of everything which, according to the deed, limits said right and the privileges of the grantee, for the benefit of another, whether a definitely named person or not, as well as the time when the obligations contracted mature, if those recorded be of this character."

"ARTICLE 75. Records of any kind shall be made in the following order:

"*First.* .    .    .    .    .    .    .    .

"*Sixth.* A true copy of the conditions imposed on the grantee or his successors which in any way restrict the privileges of ownership."

Section 264(2) of our Civil Code, adopted from § 471 of Louisiana, defines as immovable, from the object to which they apply, among others, "Any right or obligation established on any immovable." This text is in harmony with our mortgage system of the *numerus apertus.* Vallet de Goytisolo expresses his opinion in *Revista Crítica de Derecho Inmobiliario* 175 (1961) that the theory of *numerus clausus* of the property rights or of the recordable rights may be a convenient system for the officers, but essentially antijuridic.

[6] See their recent work *Apuntes de Derecho Inmobiliario Registral* 579 (2d ed. Madrid, 1967).

rights, for example, in the case of the rights of use and habitation, although they actually involve cases of non-existence of the power to dispose, and not of the existence of the prohibition.

(d) That the prohibition devolve upon the *ius disponendi* of the right, the prohibitive rules referring to the object of the act (§ 1223 *et seq.* of our Civil Code) or to its contents (§§ 1207, 1582, 1757, 1859, etc. of said Code) not being, in the technical sense, prohibitions to alienate.

(e) The prohibitions to dispose must be temporary, not permanent.

(f) They must respond to a juridical interest, to a justified cause or reason, or a reasonable purpose.

(g) They do not attribute a right to another person. With this trait or characteristic essential in the prohibition to dispose, it is easier to distinguish this figure from other marginal notes, like the substitution of trust, the option and preemption, the exclusive clauses of sale or purchase, etc.

## IV

The problem presented by the registral aspects of the voluntary prohibitions to dispose has seldom come to our consideration. The respondent registrar cites *Van Syckel* v. *Registrar*, 3 P.R.R. 9, 2d ed. (Quiñones) (1899), and *Luiña* v. *Registrar*, 3 P.R.R. 18, 2d ed. (Quiñones) (1900), several times in support of his position.

In the first case the registration of an agreement not to alienate a rural estate, object of a lease contract for an indefinite period, was denied on the ground that it was not recordable. We concurred with the qualification challenged in view of the fact that it was an agreement not to alienate for the purpose of protecting the lessee against subsequent purchasers or lessees of the property, which protection was unnecessary and useless, since by recording the contract he was protected against third parties, and because said agree-

ment "unnecessarily prejudices . . . the owner." In the sense of being unnecessary and useless as a cautious or protective measure there, we qualified the agreement as an "undue encumbrance," since it did not respond to a juridic interest, to a justified cause or reason or reasonable purpose and it caused more prejudice than benefit.

By the same token, in *Luiña* we affirmed the refusal to record an agreement not to alienate a property awarded in a partition of an estate with the obligation to pay certain debts from the hereditary estate, since upon recording said adjudication the property would become encumbered as a guarantee of the payment of such debts and the imposition of another encumbrance for the same purpose was unnecessary.

In the cases of *Torres* v. *Registrar of Caguas*, 27 P.R.R. 846 (Hernández) (1919) and *Llinás* v. *Registrar of Ponce*, 33 P.R.R. 885 (Franco Soto) (1925) we considered valid and recordable two contracts of sale, containing clauses which provided that the vendor reserved the ownership title of the property sold until the extinction of the debt. During that lapse of time the respective purchaser was practically and absolutely deprived of the power to dispose of or alienate the property. The reservation of the ownership title was equivalent to an effective security of the payment agreed upon.

In *People* v. *Rodríguez*, 51 P.R.R. 306 (Travieso) (1937) we decided that the prohibition to mortgage, imposed by Act No. 53 of 1921 on owners of buildings erected on lots belonging to the People of Puerto Rico granted to them in usufruct for life, was constitutional. Among other things, at p. 311 of the aforecited volume we said:

"The restrictions imposed by law and by the grant of the lot are, in our judgment, just, reasonable, and absolutely necessary for the success and existence of the workmen's ward of San Juan. And the effect of the declaration of nullity requested would be to

oust numerous families, now living in their own homes, and to make of the workmen's ward a field of exploitation of said families, compelling them to become tenants of the money lenders.

"The contention that the law is immoral because it permits the contract for a loan and prohibits a mortgage to secure the same is erroneous."

Although that was a lawful prohibition, the efficacy and validity of the same was upheld because it was fair, reasonable, and absolutely necessary to carry out the objectives and purposes of the law which established it and it was not an arbitrary and capricious legislative measure.

In *United States of America* v. *Registrar*, 64 P.R.R. 933 (Snyder) (1945) the respondent Registrar denied record of a clause in a contract of sale which imposed the restriction that the purchaser shall not transfer, alienate, mortgage, lease, or in any other way dispose of the property object of the sale without the prior written consent of the vendor, which was the government of the United States of America. He also denied record of certain resolutory conditions.

By Act No. 163 of 1940 the Legislature of Puerto Rico authorized the government of the United States to impose such prohibitions to alienate, and resolutory conditions on certain sales of immovables which it intended to make in Puerto Rico.

The refusal to record was based, in relation to the prohibition not to dispose, on the fact that the same was "contrary to law and especially to the letter and spirit of Sections 276 and 280 of the Civil Code . . . inasmuch as it deprives the purchaser of the free disposition of what he acquired as owner, which right is the basis and essential ground of the right of ownership, the registration of which is requested . . . ."

Notwithstanding the brilliant effort performed by the respondent Registrar in his extensive main brief and in his reply, we reversed his refusal and ordered record of the

document free of defects. Although in order to so decide we relied on the fact that the prohibition to dispose agreed upon had been authorized by the legislature, and we lacked power to judge the legislative wisdom in permitting such agreements in juridic acts for a valuable consideration between the federal government and private citizens, we also sanctioned the legislative measure involved by saying, among other things: "The United States embarked in 1935 on a vast program of resettling thousands of our landless rural population on their own small tracts of land. But past experience in Puerto Rico indicated a tendency among our small landowners to sell and to mortgage their land to large interests. To avoid this condition, the aid of the insular Legislature was enlisted, and Act No. 163 was enacted."

In the case of *Commonwealth* v. *Márquez*, 93 P.R.R. 382 (Rigau) (1966) we affirmed the judgment appealed from in which a certain sale of the perpetual usufruct of a parcel of land situated in the municipality of Luquillo was declared null and void on the ground that said transaction was contrary to the prohibition to alienate under penalty of absolute abatement, as prescribed by § 76 of the Land Law of Puerto Rico of 1941, as amended. In the opinion the constitutionality of the limitations and restrictions, which by reason of public policy may be imposed on the ownership right, is upheld and several cases are cited where, in Puerto Rico, prohibitions to dispose have been legally imposed. It is decided that for legislation of this nature to be declared unconstitutional, it is necessary that the same "be clearly arbitrary and that it bear no reasonable relation to the public purpose contemplated." (Page 391.)

█ We have made reference to the preceding decisions where the validity of certain legal prohibitions to dispose have been challenged, because, as we have seen, in the determination of the juridic efficacy of the legal as well as the conventional, there prevails, together with other principles,

the view or rule that they should actually and effectively respond to a juridic interest, to a justifiable cause or reason, or a reasonable purpose in relation to the statute which creates or permits it, or to the principal juridic act to whose innermost and essential elements the prohibitions are connected.

## V

There is a series of figures which could induce to possible confusions and should be excluded from the qualification, consideration, and treatment of real and typical prohibitions to dispose or alienate. Chico Ortiz and Bonilla Encina,[7] at pp. 583, 588 give us the following traditional outline thereof:

"a) Obligatory agreements not to dispose.— Sanz states that the prohibition to dispose affects the right itself, which appears limited by the former, while the obligation not to dispose does not affect or limit the right, since, notwithstanding the obligation, the right subsists in its entirety, and the title holder retains the disposition thereof, since if he disposes, the only result produced is his obligation to compensate, derived from the obligation agreed upon.

---

[7] Both jurists believe that the mortgage reform of 1944, in relation to the prohibitions to dispose "will be incomplete as long as the civil legislation omits the convenient development of a subject-matter which, because it is extraneous to this act, has not been the object of more careful consideration." P. 589.

Pursuant to this reform, the prohibition established in an act for a good consideration is the only prohibition to dispose which may be admitted to record where a qualified statement shall be made of all the limitations of the powers of the acquirer, literally copying the suspensive, rescissory, resolutory, and revocatory conditions, without stating in any case whatsoever the stipulations, clauses, or agreements lacking real transcendency. As to those for a valuable consideration, if they are contained in a recordable instrument, as provided in § 434(2) of the Spanish Regulations, "the title may be admitted to record and the record of the stipulation denied."

However, the Spanish reform left in force articles such as 2(4), 9(2), 42 of the Law and Arts. 7 and 51(6) of the Regulations, which do not oppose the admission to record of the voluntary prohibitions in acts for a valuable consideration, or agreements with analogous real effects.

"While the prohibition to dispose may be admitted to record, the obligation not to dispose, due to its purely obligatory interest, is excluded from record (Arts. 98 M.L. and 9 M.R.)."

"b) Incapacities and prohibitions.—At the outset we pointed out how, in the acts to dispose, the requirements of capacity and the power to dispose were indispensable, according to the most modern juridical tendencies. Now then: the incapacity merely eliminates one of said elements: the capacity. The prohibition eliminates the power to dispose, that is, it presupposes an absence of legitimate power to dispose, if the prohibition would affect, not the power to dispose, but the subject of the title holder. Roca Sastre, remarkably, arrived at the same conclusion when he said that both, the prohibition and the incapacity, suffer from an abnormality or defect which precludes from performing, legally, an act of disposition; but in the incapacity this abnormality or defect is on the person of the title holder of a right, while in the prohibition it is on the right itself. Incapacities are the ways a person is or becomes, having a marked subjective character (under age, insanity, stupidity, deaf-muteness, prodigality, and civil interdiction), while the prohibitions are the ways a right is or becomes, being of a purely objective nature, since they imply a temporary or definite deprivation of the exercise of the power to dispose. The incapacities create a voidability of the act, while the prohibitions create an absolute nullity, in the majority of the cases.

"Another possible distinction between incapacity and prohibition is that while the defect of incapacity may be legally cured by means of the assistance of counsel or by licenses or authorizations, it is impossible to cure the prohibition until it terminates or disappears. These ideas are reflected by several Orders of the General Directorate, specifically, those of June 22, 1943, April 21, 1949, and April 18, 1952, which insist on the difference between capacity and prohibition, considering that in the last instance there is no power to dispose and it cannot be cured like the lack of capacity."

"c) Other related figures.—Within this group we want to include a series of situations or juridic figures which have been practically outlined already in structuring the features which we pointed out in the prohibitions to dispose. We shall proceed to an almost schematic enumeration thereof:

"—Nonexistence of the power to dispose.—The clearest cases are those of rights of use and habitation (§ 525 C.C.), those originating from bailment and commodatum, as well as all those things not capable of holding transferable rights—as stated by Moxó—things extra commercium, public property, artistic patrimonies, etc.

"—Existence of a right in favor of another person.—In cases of option, preemption, and the clauses of exclusion previously pointed out, we want now to emphasize the proposition of the substitution in trust. From the obligation to deliver which § 783-2nd of the Civil Code imposes on the fiduciary, it was inferred, doctrinally and jurisprudentially, that there existed a prohibition to dispose, except in case the testator has otherwise provided or in case all the beneficiaries consent to the disposal (Judgments of January 29, 1916 and November 3, 1932). Properly, the reason for the temporary limitation of the power to dispose is that the property is subject to restitution. Roca Sastre points out that the prohibition to dispose and the substitution are two different things, that even in the very Code they are treated independently, as shown by § 785, when referring in No. 1 to the substitutions and in No. 2 to the prohibitions.

"Lis pendens and accessory determinations.—Moxó Ruano —followed by Canovas Coutiño—is the one who confronts the difference in these situations of the prohibitions to dispose. He includes in the first group, all those which Ennecerus, Thur, and Ihering called rights in a stage of development, rights of expectancy, rights in waiting, and states of indecision, which De Castro, in our Law, groups under the label of temporary situations. Likewise, he includes in the first group the new theory of the potestative rights, of formation or modification. All these situations—he says—may entail and do entail effects of unavailability, but they are not prohibitions to dispose. They are states of law where some formative or final, essential and decisive element is lacking for their full existence or validity, but which affect the right outwardly, properly speaking, and not its fundamental internal structure."

## VI

In the light of the foregoing, it is impossible to agree with the qualification and treatment of the true prohibition

to dispose attributed by the respondent to the agreement by which the purchasing religious order "binds itself . . . not to assign, alienate, sell, or encumber in any manner whatsoever . . . the use or usufruct of the land and whatever is built thereon, to any entity or person, except to the . . . Catholic Church. . . ."

This is an obligation not to dispose concerning the use and usufruct of the parcel of land and whatever said order may build thereon. Considering said agreement separately, without any ties or relation whatsoever to the purpose, objectives, and essential aims of the recorded principal juridic act, the same is actually a purely personal obligation. If the free power to dispose of the absolute ownership of the property was not affected or limited thereby, we would have, as the respondent indicates, a purely personal obligatory bond, which only granted the transferor the exclusive right of the future acquisition of the property.

However, in the contract that agreement does not appear separate from the others. The parties are religious institutions; according to the Registry, at the time of execution, the Catholic Church is the title holder of the parcel transferred; the contract is denominated "sale"; but according to the SECOND clause such sale is executed for (A) the price of one dollar which the vendor confesses having received from the purchaser prior to this act; (B) for other considerations of immensurable religious significance, and (C) taking into consideration, also, "the investment of seventy-five thousand dollars that The Order of Friars Minor of the Province of the Most Holy Name will make on the land *hereby conveyed*, for the construction of a church, parochial house or residence, a school and other dependencies." (Italics ours.)

According to the THIRD clause the parcel of land is assigned "so as to endow the community of Caparra Heights Extension with religious and educational facilities and spe-

cifically to endow it with a church." The essence of the idea, common intent, and purpose of the parties was thus reflected, and the interpretation of the contract should center around the THIRD stipulation, because it is the basis thereof. It is the spark of light which makes it clear.

The parcel of land is valued "for all pertinent legal purposes," at $18,181.10, that is to say, at the rate of $5 per square meter. It was agreed that the purchaser would pay all execution expenses and the recording of the instrument.

Among all those obligations and commitments assumed by the purchasing order we find: not to alienate the use and usufruct to any person or entity whatsoever except in favor of the Catholic Church and to sell to the latter, for $2.00, the parcel of land and its structures in the event the former "must leave or definitively depart from the island." These are preventive measures of caution, preservation, guarantee, and security to give stability, continuity, and fulfilment to the true and only purpose of the contract: "to endow the community of Caparra Heights Extension with religious and educational facilities and specifically to endow it with a church."

The juridic act executed by both institutions can hardly correspond, in positive law, to the designation of "sale" which appears in the document. But its validity is unquestionable. The requirements of consent, true object and consideration, concur perfectly.

The price of one dollar, previously received, for a parcel of land valued at more than $18,000 in addition to other considerations of immensurable religious significance, removes any idea of or resemblance to a purely typical sale. Obviously, we are not dealing with a lucrative transaction or with pecuniary objectives. It was the fulfilment of a common spiritual objective, institutional essence of both contracting parties, which induced them to execute it.

We could qualify the stipulations, clauses, and agreements as a whole, as a modal gift, where the beneficiary is bound to use all the parcel of land donated for a determined purpose, executing the following condition in favor of a specific community ". . . to endow the community of Caparra Heights Extension with religious and educational facilities and specifically to endow it with a church."

At law, the effects of this modal obligation are always produced, irrespective of whether the burden imposed by the modus is or is not complied with. It is an accidental element of the contract by which the special objective of the gift was designated. The modus presupposes a limitation of the will, which bound coercively the donee religious order to execute said promise for the benefit of said community. See §§ 560(2), 561, and 589 of the Civil Code.

If the title of ownership of the parcel was conferred to The Order of Friars Minor of the Province of the Most Holy Name subject to the performance of a particular act, said clauses as a whole gave rise to a subjection, more or less inherent to the thing donated and it created a recordable juridic situation.

The obligation not to alienate the use or usufruct, we repeat, was self-imposed to secure, against third parties, the continuity of the rendering of educational and religious facilities and services to the aforementioned community. For that "price" the Catholic Church "sold" the parcel of land.

The transaction, considered as a whole, has the tone of a simple fiduciary transfer or the gratuitous assignment of the surface right for an indefinite period, to which § 1503 of the Civil Code and Art. 107(5) of the Mortgage Law refer. Sometimes its language imparts the idea that the Catholic Church did not want to perform a complete and definite transfer of ownership, but an imperfect one, and

hence rules were adopted for the possible and future redemption, for a symbolic price of the land which it "assigns"—that is the verb used in the THIRD clause—as well as its structures, schools, parochial house and churches.

Appellant's distinguished attorney, who was the notary who executed the document, is inclined to consider the transaction "as equivalent to a gift on account of the difference between the actual value of the land and the price received" and he maintains that such gift was subject to all the conditions imposed by the title of its constitution and that "nobody would challenge that the conditional gifts are authorized by our substantive law." This is correct, pursuant to the provisions of §§ 560, 561, 564, 568, and 589 of said Code. The same is true with the testamentary provisions. Sections 710 to 720, Civil Code.

As we have said, the Spanish mortgage reform admitted to record the legal prohibitions to alienate as well as those imposed in juridic acts for a good consideration. Authority of law having been recognized to the will of the testator and the same value and respect having been given to the liberality of the donor, or of any transferor for a good consideration, in Art. 26 of the Mortgage Law it was provided, in part:

"Section 26.—The prohibitions to dispose of or alienate shall be recorded in the Registry of Property and shall produce effects according to the following rules:

"First: .    .    .    .    .    .    .    .    .

"Third: Those imposed by the testator or donor in an act or disposition in his last will, articles of marriage, shall be recordable provided the law in force acknowledges their validity."

Considering the religious and educational services to be offered the transaction could be considered also as an onerous gift.

## VII

It is true that our Mortgage Law, in subdivision 4 of Art. 107, voids the agreement not to mortgage again property previously mortgaged. But its rejection of the prohibitions to dispose is limited to such agreement only which, on the other hand, and generally, as we have stated, could be admitted to record here, provided they are not contrary to the law, morals, and public policy. Such special refusal is justified because the agreement not to mortgage again is, as a general rule, a requirement obtained as a result of the precarious situation of the debtor, and his ruin may be caused by his impossibility to pay his debts because he cannot mortgage for a second or successive times his mortgaged property.

This cautionary provision in our Mortgage Law—which is preserved in subdivision 3 of Art. 107 of the Spanish Law—responds to the purpose of not reducing the credit secured by real estate. But it has been erroneously inferred therefrom by the advocates of the *numerus clausus* that it constitutes a general unsurmountable juridical obstacle against the voluntary prohibitions to dispose or alienate.

As Roca Sastre states, Vol. IV, p. 201, 1948 ed., *op. cit.*, the provision proclaims the possibility that the same thing be indefinitely encumbered with successive mortgages and also it establishes the inefficacy of the agreement of not mortgaging a thing again, contained in the constitution of a previous mortgage. Furthermore, at page 204, he states that the lawmakers of 1861 technically supported the declaration of inefficacy of the agreement not to remortgage "in the reasons which serve as the basis to the doctrine of the prohibitions to dispose: when the interest fails to be serious and legitimate." He also maintains that Art. 107 is silent on the agreement with the prohibition to alienate, lease, or execute recordable acts in relation to mortgaged properties, although

the Spanish case law and Art. 27 of the Law extend the mortgage refusal to these acts.

▉ Since our Art. 107(4) exclusively refers to the "Property previously mortgaged . . . under an agreement not to mortgage it again" we cannot consider it applicable to all the other possible juridic relations, where the prohibitions to dispose are imposed on pure acts or contracts to alienate, not on those of encumbrances. The agreement to which Art. 107(4) refers is not present in this appeal, and in a property registration system of *numerus apertus* the exceptions must not be interpreted broadly.

Referring to the conditions of the contract, appellant alleges that the same produce "the modality and concept of a sale with right of redemption, which agreement consisted in that if the purchaser desired to assign, alienate, sell, etc. at any time, it was bound to sell exclusively to the Catholic Church."

We do not agree with that conclusion. We cannot, even remotely, conceive the transaction as a sale with right of redemption, for the following reasons:

A—Since the right of redemption constitutes a limitation or restriction to the power to dispose of the purchaser— who only acquires a resoluble, imperfect conditional, fortuitous title at sufferance, during the effectiveness of the agreement—it must be constituted expressly, clearly and specifically, as every stipulation of exceptional or privilege rights.[8]

---

[8] The right of redemption or conventional redemption, of ancient origin, has also served as medicine to cure, but more often as poison to kill. For centuries it served as an inexorable instrument to human greediness. It mocked the precepts which prohibited the forfeiture agreements, the rules against usury, the principles of equity and good faith concerning private contracts relating to real property.

Several Latin-American countries have put aside said juridic institution from their civil codes or have modified its undesirable consequences. Argentina forbids it in its § 1380, in relation to private property; in Cuba it was abolished by military order of August 1901, and has not been re-established at the present time; Guatemala, in its § 1791 decreed: "The

In the case at bar it was not so done, the term redemption does not even appear in the FIFTH clause.

■ B—The conventional redemption is only proper in relation to the contract of sale. The transaction involved in this appeal is not actually a sale, although it is so denominated. "Returning to the vendee the price of the sale" to which § 1407 refers would be practically impossible. It is a gift subject to conditions which are practically resolutory, or of gratuitous reversion in the light of the provision of § 583 of the Civil Code.

C—There was no agreement as to the duration of the so-called right of redemption. The four years fixed by § 1397 of the Civil Code, as the term of duration of the right, in the absence of an express agreement, assuming that the

---

right of redemption is hereby prohibited"; in Mexico, although a certain right of preference in future sale is granted, its § 2302 provides: "Every sale with right of redemption is hereby prohibited, as well as the promise of sale of a real estate which has been object of a sale between the same contracting parties"; Panamá, in its § 1277 also provided: "The right of redemption is hereby prohibited."

Portugal prohibited it in § 1567 in its former code. We do not know whether the code of July 1967 prohibits it.

On the other hand, Chile, § 1884; Colombia, § 1942; Ecuador, § 1944; El Salvador, § 1682, and Perú, § 1448, prohibit its voluntary cession and transfer by inheritance.

In Puerto Rico, the conventional redemptions which concealed real usury loans, suffered a severe blow in the year 1916 with the approval of Act No. 47 on April 13 of said year, to repress usury, which provided in its § 1 that any sale of real estate on reversion shall be presumed to constitute a contract of loan for the amount of the price with a mortgage security in cases of nondelivery of possession, payment of interest and price grossly inadequate. The Philippines adopted a similar measure in its § 1602.

Venezuela, in § 1546 of its Code of 1942, limited the legal redemption to the co-owner, and this only "in the case the thing cannot be divided conveniently or without detriment."

After the approval of said Act No. 47 we can assure that the institution of conventional redemption fell into disuse here. The great majority of our decisions, from *Lizardi* v. *Registrar of Caguas*, 24 P.R.R. 804 (Hernández) (1917) to *Shivell* v. *Barber Boscio*, 92 P.R.R. 387 (Rigau) (1965), about 57 cases, deal with legal redemption.

right of redemption had been legally agreed upon, as of December 20, 1959, about three years had expired prior to the request of the record of the document in the Registry, which means that if it were recorded with such condition of redemption, a lapsed right would have been recorded, juridically nonexistent at that time.

## VIII

In none of our decisions has the "complete refusal" of the prohibitions to alienate been decreed, as the respondent affirms at p. 9 of his brief. If in *Van Syckel, supra,* or in *Luiña, supra,* we said that the agreements therein involved were not recordable, or should be entirely ignored, it was due to the fact that under the particular attendant circumstances therein, the prohibitions to dispose involved did not respond, as we stated at p. 519 to a juridic interest, to a justified cause or reason or to a reasonable purpose. But if we so decree, we incur a violation of the articles of our Mortgage Law and its Regulations which permit the admission to record of legal conditions modifying, limiting or restricting property rights.

The term "inofficious" we repeat, is used as a synonym of unnecessary, as we used it in *People* v. *Ortiz Díaz*, 95 P.R.R. 237 (Santana Becerra) (1967) in saying, among other things: "We agree with the trial court that under the circumstances of this case it was unnecessary and inofficious to return to the preliminary proceedings . . . ."

The two agreements of the FIFTH clause do not produce the same effect, nor does one exclude the other, nor are both predicated on identical presumptions, for which reason the recording of one does not make unnecessary or inofficious that of the other.

Affirming that in modern times the sense of the true and real purpose has prevailed dispensing with conceptual reasonings, Vallet de Goytisolo in his article *Determinación de*

*los Derechos,* published in 34 *Revista Crítica de Derecho Inmobiliario* 164 (1961), states:

"The inseparability in a recordable title of the property elements and some obligatory agreements which constitute with the former a whole unit has been weighed, and is also weighed, sometimes with this same sound view. Thus, the judgment of the Supreme Court of June 27, 1955 decreed that the penalty clause established in the constitutive title of a voluntary servitude *in non faciendo,* in the event the title holder of the servient tenement violates the agreements, implies an accessory stipulation of the servitude, not separable therefrom, which, upon being entered in the Registry, affects any acquirer of the servient tenement on whom it would be binding if the violation were committed.

"With the same sound view the statutes of horizontal apartments having agreements as to the distribution of expenses and to certain prohibitions of an obligatory nature, but which are inseparable from the community relationship, are recorded without discrimination. The same thing occurs, undoubtedly, with the regulations of riparian co-ownership, and generally, with almost all common ownerships, or with such servitudes which require for their use the compliance with certain maintenance duties on the part of the owner of the servient tenement."

In the orientational opinion of *Ortiz* v. *Registrar,* 82 P.R.R. 487, 490, 492 (Blanco Lugo) (1961) we ordered the cancellation of a certain condition imposed by some donors in a gift of real property in favor of several brothers in the sense of "mutual preference between co-owners in case of sale or encumbrance of their respective shares unless none of them be interested in the purchase or lien."

Among other things we decided in that appeal:

"[2, 3] Now, as pointed out by Jerónimo González, an authority on mortgages, 'there exists a group of juridical figures of the undifferentiated type which must be dragged to the obligational field or to that of the real property.' This position is based on the premise already accepted in Puerto Rico in the aforesaid case of Baldrich, *supra,* that 'the legislation now in effect

does not contain an exhausting category of property rights, the interested parties being able to regulate others of the same nature as those enumerated in the Act, and *modify, of course, or in the future, some of the powers of ownership.'* The existence of certain rights which depending upon their configuration, partake of a personal or real nature, cannot be ignored. This is what has been earmarked as 'intermediate zones of interference or juridical semi-obscuredness, in which the personal subtlely infiltrates as a phosphorescence, through the real or in which the real strengthens with its erga omnes potentiality the obligatory ties.' Among these rights we find the right of preemption.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"[4] On the other hand, such clause being considered as a restrictive condition of the *ius disponendi* of an immovable, its registral survival is equally not justified, once the state of indivision or community of property that gave it life disappears. As it may be seen, the donors simply established a reciprocal preference among the co-owners in case of sale or encumbrances of their shares for the purpose of preventing the participation of strangers in the community that was created among the brothers and sisters by virtue of the donation. But once the community of property in question ceased, as well as in the others, object of donation, *the reason for such preference disappears by the expression of the will of the only ones interested.* The waiver by the interested parties to which the refusal note refers *would be entirely superfluous by reason of their eloquent expression upon dividing the community* and making specific adjudications in payment of their respective interests in all the property possessed in common.

"In view of the foregoing, the registrar's note will be reversed." (Italics ours.)

It is true that the conditions established by both agreements which integrate the FIFTH clause do not appear specially and perfectly framed as pure property rights if said agreements are judged and qualified entirely independently of the other clauses, conditions, and stipulations of the document. However, the Registrar recorded the second, to which the present appeal does not refer. The first should also be

recorded, considering it, as appellant states, "concomitantly with the intention of the parties, objects, and purposes of the contract," and taking into consideration also that it is an integrant part of a nonprofit transaction and which, actually, can only be qualified as a gift.[9]

The note appealed from will be reversed in its negative aspect and the record of the document as a whole will be ordered.

---

[9] In *Torruella* v. *Registrar of Property*, 13 P.R.R. 142 (1907) and *Hernández, Trustee* v. *Registrar*, 55 P.R.R. 113 (1939) we considered valid certain testamentary prohibitions to alienate and void the acts executed against the same.

See the commentaries of professor Ramírez Pabón, in his work *Derecho de Propiedad* 107–109 (1965) and the interesting thesis of Carlos Martínez Vélez, *Las Limitaciones a la Facultad de Disponer en Nuestro Derecho* (1967) in the catalogue of the library of the School of Law, University of Puerto Rico.